RANDY SUE POLLOCK
Attorney at Law (CSBN 64493)
286 Santa Clara Avenue
Oakland, CA 94610
Telephone: 510-763-9967
Facsimile: 510-380-6551
rsp@rspollocklaw.com

Attorney for Defendant
HOWARD SOLOMON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR 25-00054-001-YGR |
| ) | |
| Plaintiff, ) | |
| vs. ) | |
| ) | **DEFENDANT HOWARD SOLOMON'S** |
| ) | **SENTENCING MEMORANDUM** |
| ) | |
| HOWARD SOLOMON, ) | |
| ) | |
| Defendant ) | Sentencing Date:   September 18, 2025 |
| ) | Sentencing Time:  9:00 a.m. |

## PRELIMINARY STATEMENT

Mr. Solomon stands before this Court having engaged in serious fraudulent conduct that was an abuse of his position of trust with a prominent local non-profit dedicated to helping young children. Despite Mr. Solomon's commitment to helping his community, his criminal conduct resulted in a significant misappropriation of funds intended to help disadvantaged children in that same community. As probation has correctly said, the nature and circumstances of the offense cannot be justified or understated.

Mr. Solomon has had two years to focus on the consequences of stealing funds from such an important local organization. While he did not engage in significant self-reflection until the FBI searched his home, he has done so to an extent far more than most defendants in the criminal justice system do.[1] He has pled guilty and fully accepted responsibility for his conduct. He is sincere in his remorse for the breach of his trust for the community he sought to serve. He does not seek forgiveness, nor does he seek to excuse his conduct. As this memorandum will explain, it is the position of the defense that the downward variance to 18 months, recommended by probation, is a sentence that is sufficient but not greater than necessary to meet the statutory goals of sentencing.

## I.
## THE FUNDAMENTAL RULES OF SENTENCING
## STRESS THE NEED FOR INDIVIDUALIZED SENTENCING

The sentencing guidelines were originally designed to moderate unwarranted disparities in federal sentencing by enacting a set of complicated rules that would cause federal judges to impose for any given crime a sentence approximately equal to what empirical data showed was the average sentence previously imposed by federal judges for that crime. See *Kimbrough v. United States*, 552. U.S. 85, 96 (2007).

Federal law since *United States vs. Booker*, 543 U.S. 220 (2005) however, has recognized that the sentencing guidelines are advisory only, not mandatory. It is the directive of Congress that the district court "shall impose a sentence sufficient, but not greater than necessary, to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation. *Dean vs. United States*, 137 S.Ct. 1170, 1175 (2017) (emphasis added). Further, in *Pepper vs. United States*, 131 S.Ct. 1229, 1240 (2011), the Court emphasized the need for individualized sentencing, reiterating "the principle that 'the punishment should fit the offender and not merely the crime.'" The court in *Pepper*, supra at 1239-40, explained:

---

[1] See Mr. Solomon's letter to this Court. **Exhibit A** and his letter to EOBA, **Exhibit B**.

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

As was also explained in *Beckles vs. United States*, 137 S.Ct.886 (2017), "although the Guidelines remain the "starting point and the initial benchmark" for sentencing, a court may no longer reply exclusively on the Guideline range; rather the court "must make an individualized assessment based on the facts presented…" (emphasis added). *United States v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006), noted the appropriate guideline range is no longer "the end of the sentencing inquiry; rather, it is just the beginning."

Congress intended the courts to first determine whether to imprison considering the characteristics of the defendant, the circumstances of the offense, and all the purposes of sentencing, considering probation as one of the "kinds of sentences available." Incarceration is not intended as a default sentence.

A pivotal decision explaining the purpose of Section 3553(a) was written by Judge Rakoff in *United States v. Gupta*, 2012 U.S. Dist. LEXIS 154226, at *15–16 (S.D.N.Y. 2012). In that decision Judge Rakoff turns to what he refers to as the "bedrock of all federal sentencing, Section 3553(a) of Title 18, entitled "Factors to be considered in imposing a sentence." In determining whether a sentence is "sufficient, but not greater than necessary" to accomplish the purposes of punishment, courts must consider the nature and circumstances of the offense and the history and characteristics of the defendant", §3553(a)(1); the guidelines sentencing range and any applicable Sentencing Commission policy statements, §3553(a)(4), (5); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." §3553(a)(6).

The judge then tackled the question of how a court balances the criminal conduct with the character of the offender---what he refers to as "polar extremes." He quoted from the senior United States Probation officer in *Gupta* who argued for a non-custodial sentence:

> "We believe the defendant's commission of the instant offenses was aberrant behavior---Not aberrant as defined by the U.S. Sentencing Guidelines, but rather as defined by Merriam-Webster…. atypical.'"

While noting the other important considerations of sentencing; namely, specific deterrence, general deterrence, just punishment and the requirement that any sentence imposed be "sufficient, but not greater than necessary, to comply with [these] purposes," the Court agreed, and found that the aberrant nature of Mr. Gupta's conduct by itself would warrant a non-guidelines sentence, even aside from the other factors favoring leniency.

Counsel's reference to the opinion in *Gupta* is not to support a sentence of probation in this case. There is no question that prison is warranted for Mr. Solomon's conduct based on the offense conduct and the need for general deterrence, however Mr. Solomon's individual characteristics, both before, during and after the commission of this offense, must be considered equally with the offense conduct.

## II.
## THE ROLE OF GENERAL DETERRENCE
## IN SENTENCING WHITE COLLAR DEFENDANTS

One of the primary justifications for imposing a prison sentence is that it will deter both the defendant--special deterrence-- and those similarly situated--general deterrence--from engaging in future violations because the cost of committing a crime will exceed the benefit. The latter is sometimes explained as the effect that penalties will have on the public's views about the relative seriousness of various crimes. Recently the question of what is an appropriate sentence for white collar defendants was considered by Professor Peter J. Henning in an article he wrote in the Wayne Law Review entitled "*Is Deterrence Relevant In Sentencing White-Collar Criminals*" (61 Wayne L.Rev. 27 (2015-2016). Professor Henning, a former federal prosecutor, wrote that "it is the

likelihood of a conviction, not just the severity of the punishment that influences how individuals act when deciding to pursue a criminal aim" at 61:47.  As explained by Professor Henning:

> … "deterrence serves as a factor in ascertaining what type of punishment a defendant should receive, but it cannot be the featured player in the assessment of a penalty…Reference to the deterrent message of a sentence informs the public that this is conduct that must be prevented and that some measure of punishment is appropriate, even taking into consideration the positive attributes and contributions of an individual offender." at 61:58.

> *Deterrence should not be the driver of the decision about the appropriate punishment, but it should not simply be ignored. Judges should be aware that there is little deterrent impact from a sentence, especially in cases involving white-collar crimes. Yet they should understand that consideration of it can provide, along the lines offered by Professor Kahan, a moderating influence on the discussion of what constitutes the proper punishment. Even if it does not actually deter other potential defendants, it can deter judges from going to one extreme or the other in imposing a sentence because it requires consideration of the impact on society and not solely the particular offender. Thus, one should not ask whether a particular sentence will deter others from committing white-collar crimes, because it will not. Instead, ask whether there is a message in the sentence to society that the court views this violation as serious enough that it ought to be deterred, and how much deterrence is appropriate when taking into account the cost of incarceration and the impact of others, regardless of whether anyone will actually hear that message. (emphasis added.*

Accordingly, Mr. Solomon addresses the following section 3553(a) factors for the Court's consideration in its determination of the appropriate sentence in this case.

### III.

### APPLICATION OF SECTION 3553(a) FACTORS

**A. A First Conviction Justifies a Downward Variance**

In 28 U.S.C§994(j) Congress stressed the "general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense[.]"  In *United States v. Huckins,* 529 F.3d 1312 (10th Cir. 2008), the court explained that "a district court may weigh a defendant's lack of

a criminal record, even when the defendant has been placed into a criminal history category of I, in it's §3553(a) analysis."

The "first offender" philosophy in sentencing policy encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they deserve reduced punishment. Congress itself in the Sentencing Reform Act of 1984 promotes the first offender philosophy, citing the relevance of reduced sentencing levels for first offenders under the federal sentencing guidelines. Now with USSC §4C1.1, there is further recognition that individuals with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points. Studies have shown that those offenders with zero criminal history points who have never been arrested before also have the lowest recidivism risk of all. See USSG study *"Recidivism and The First Offender,"* May 2004.

Additionally, the USSC's own research has suggested that the proper application of §3553(a) in the case of a "true" first offender now strongly supports a below-guideline variance because of 3553(a)(2)(C) and 3553(a)(6). See *United States v. Cabrera*, 567 F.Supp.2d 271 (D. Mass. 2008). This is noted by the Probation Officer in ¶85 of the PSR which says that for the last five fiscal years (FY 2020-2024) the average length of imprisonment for offenders convicted of §2B1.1 with a final offense level of 18 and Criminal History Category of I was 19 months and the median length of imprisonment was 18 months. Additionally, the sentence for fraud/theft/embezzlement offenses in NDCA for fiscal year 2024 was 15 months. Also, for 80 fraud/theft/embezzlement cases in NDCA in 2024, there was a variance in 46 cases or 57.5% of the cases.

**B. An Otherwise Blameless Life Warrants a Sentence Below the Advisory Range**

In *United States v. Manafort*, E.D.VA, March 7, 2019, the defendant who was convicted of tax evasion and bank fraud and faced a guidelines range of 15-25 years received a departure to 48 months in part because of his "otherwise blameless life." Mr. Solomon has significant positives in

his character and background as shown in excerpts from his character reference letters that warrant a below advisory guideline sentence:

**From David Gnaoto[2]:**

> From the start, Solomon distinguished himself as a leader who consistently put people first. I will never forget the way he navigated one of the hardest periods in our organization's history, when a large round of layoffs became unavoidable. Solomon insisted that those impacted not be treated as numbers on a spreadsheet but as people with stories, families, and futures. He made sure resources and support were available, and he did everything in his power to help them transition with dignity. That kind of leadership is rare, and it speaks to who Solomon is at his core.
>
> On a personal level, Solomon changed my life. He saw strengths and potential in me that I had not yet seen in myself, and he created a role that allowed me to grow into my passion for social good and equity work. Because of his mentorship, I have built a career focused on creating positive impact in communities. More than that, he modeled what it means to lead authentically. He never made me—or anyone he worked with—feel like they had to be anything other than their most genuine selves.
>
> I recognize that Solomon has taken responsibility in this case. While the circumstances are painful, they do not define the man I know. He has expressed deep regret over the mistakes that brought him here, and I believe he is genuinely committed to personal growth and to continuing his lifelong work of lifting others up. The Solomon I know is someone who sees people fully, creates opportunities for them, and never stops pushing for fairness and compassion. [Letter from Davide Gnoato]

**From Christopher Rose:**

> People have a lot of acquaintances, not many people have a lot of friends and Howard is one of mine, and for very good reasons. Howard is one of the kindest people I know. Good or bad times he is always there to offer pleasant words, heartfelt prayer, or sometimes just sit in silence with you while you grieve. He has never asked for anything in return or done it begrudgingly; he just did it because that is who he is as a person. He's kind, caring, thoughtful, and fundamentally loving.
>
> Even now with everything he has going on, when I last spoke to him all he wanted to do was make sure I was ok as I'm going through a tragically rough divorce. He wanted to pray with me and check on my children. Even in the midst of his own struggle his heart pulls him to want to help me and others. I could name endless things about his kind nature.
>
> When he lost weight and got in shape, he didn't use the new-found aesthetic to gloat; he sought to promote health and fitness to his friends for their wellbeing. When my sister was struggling to the point of grave concern but was too ashamed and prideful to ask for

---

[2] Letters from friends are in **Exhibit C**.

*DEFENDANT HOWARD SOLOMON'S SENTENCING MEMORANDUM*
UNITED STATES VS. HOWARD SOLOMON, CR 25-00054-001-YGR

7

help, he discretely called me to let me know how dire things were for her. He braved the difficult conversation she couldn't have so he could be sure she got the help she needed.

If I've learned anything through life and Christ it's that people are not their worst moments. I know Howard is not his. He's a loving father who cherishes his two daughters. He's the person who will joyfully pick up a 3 am call when you're in need even if he just went to sleep at 2 am. Howard speaks to share love, compassion, faith, and hope to those he encounters and will never hesitate to do what he can to help someone he finds in need.

A man owns his mistakes, and I know Howard has owned his. While owning them I know he is not them. I hope that this letter conveys the profound love and respect I have for Howard. He has done things for myself and my family that I could thank him 100 times over for and it would still not be enough. Please see this and find leniency for the man he is and not the position he finds himself. Thank you.

**From Shavonne Rose:**

Over the course of nearly three decades, I have had the privilege of knowing Solomon not only as a best friend, but as someone I consider family. He is the godfather to my 16-year-old son—a role he has always taken seriously, offering unwavering guidance, love, and reliability at a moment's notice and without hesitation. I proudly asked him to take on this role while I was pregnant because, deep down, I knew that if my son grew into even a fraction of the man Solomon is—full of integrity, compassion, and strength of character—I would be proud beyond words. He is the kind of role model I now know, without a doubt, my child aspires to be. The longevity of our friendship has allowed me the blessing of watching Solomon grow into a devoted father to his two daughters, Caydn and Cari. His love for them is the center of his world, and his commitment to raising them with strong values, emotional support, stability, and guidance is evident in everything he does. Fatherhood is a role he holds with the utmost seriousness, and he consistently strives to be the best example of strength, responsibility, and love.

Solomon is also one of the most hardworking individuals I've ever known. Whether he's providing for his family, offering help to someone in need, or simply staying true to his word, he shows up with dedication and purpose. He gives of himself freely and never expects anything in return.

On a personal note, Solomon has made me a better person. His loyalty and his ability to see the good in others have helped shape the woman I am today. I know unequivocally that I would not still be here on this earth had we not met over 20 years ago. I am grateful and eternally indebted to God for having him in my life, and I am forever honored to be able to say he is my friend.

Please accept this letter as a sincere and honest reflection of the man I've known for decades. He continues to grow and improve every day, showing maturity, self-awareness, and a deep desire to move forward in a positive direction. Solomon

UNITED STATES VS. HOWARD SOLOMON, CR 25-00054-001-YGR
8

has always exemplified the highest qualities of character, and regardless of what life hands him, I know he will remain a shining light in this world.

***From Luis Briseno:***

My name is Luis Briseño, and I have the privilege of being a neighbor to Mr. Solomon Howard. I've come to know Solomon not only as a kind and respectful member of our community, but as someone who consistently shows up with integrity and genuine care for those around him.

Solomon has always carried himself with a spirit of generosity. Whether it's offering a helping hand to a neighbor, checking in with a warm smile, or even something as simple as alerting me when my dogs find their way out of the yard he goes out of his way to make sure everyone is safe and supported. It's the little things like that that speak volumes about his character. While I am not familiar with the full details of his legal situation, what I can say without hesitation is that Solomon has been a positive, grounding presence in our neighborhood. He's a devoted father, a respectful neighbor, and someone I've only ever seen acting with kindness and decency.

While the Guidelines account for the offense conduct and the criminal history, §3553(a)(1) requires the Court to consider the character of the defendant. In cases where a person such as Mr. Solomon has led an otherwise praiseworthy life, a sentence below the advisory range should be considered. See *United States v. Ranum*, 353 F.Supp.2d 984,986 (E.D.Wis.2005).

**C. The Defendant Is a Good Parent**

In *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) where a client pled to possession of child porn, and the guidelines were 78-97 months, the Court granted a downward variance to 42 months because he was a "good parent" which is a valid consideration under §3553(a). As noted by probation in the justification section (pg. 23), Mr. Solomon has dedicated himself to taking on familial responsibilities for his children and his family---first his grandmother and now his uncle.

Mr. Solomon has written in his letter to this Court that "my daughters deserve a father who lives in truth." He writes as follows about his daughters:

*DEFENDANT HOWARD SOLOMON'S SENTENCING MEMORANDUM*
UNITED STATES VS. HOWARD SOLOMON, CR 25-00054-001-YGR
9

Most importantly, I am a father. I co-parent my oldest daughter and raise my younger daughter with my partner in a blended household full of love. And while it would be easier to shield them from this process, I've chosen not to. I want them to see that accountability is not shameful—it's honorable. That redemption is real. That integrity is not just about what we do in the light, but how we carry ourselves in the dark. Though my daughters won't be present in court, they will be aware of what's happening, and I know they'll carry this moment with them. I am determined to be an example of what it means to face your mistakes head-on, to grow from them, and to use them as a foundation for something greater. See **Exhibit A**, Mr. Solomon's letter.

Several of his friends have written about the role that Mr. Solomon plays in his daughter's lives:

***From Cynthia Kisling:***

> I have been particularly impressed by Solomon interactions with his own children during their time at our daycare. He displays patience, understanding, and genuine engagement with them, always taking time to listen to their stories about their day and celebrate their achievements, no matter how small. His approach to parenting reflects a wonderful balance of nurturing support and gentle guidance. The loving bond he shares with his children is evident in every interaction, and it's clear that he prioritizes their emotional well-being alongside their development.
>
> What strikes me most about Solomon is his genuine care of children and his understanding of the important role early childhood education plays in their development. He approaches every interaction with patience, kindness, and respect. The children respond to him with enthusiasm and trust, which is a testament to his natural ability to connect with young minds.

***From David Moore***:

> I have also watched him grow into fatherhood with pride and devotion. Before he had children, Solomon often worried about whether he could live up to the responsibility. Today, he has more than risen to it. He speaks power into his children, encouraging them to be confident, creative, and compassionate. They are intelligent, remarkably kind, and they look out for one another in a way that mirrors the values he instills. Their thoughtfulness and unity are a testament to the father he has become and one of the most inspiring parts of our friendship.

For Mr. Solomon, the time away from his children which includes missing their birthdays, first day of school, holidays and other important occasions is additional punishment for him. For a man whose entire life is his family the separation from them is added punishment. Being in prison

itself is punishment but coupled with separation from his children makes a prison sentence far more severe for a man like Mr. Solomon.

## CONCLUSION

Mr. Solomon has extreme remorse for his actions and acknowledges the harm that he caused to the non-profit he managed. He has explained his actions and the path he is on now. His conduct with the non-profit was aberrant behavior for him. He has absolutely no criminal record, either convictions or arrests. As he said in his letter (**Exhibit A**):

> Your Honor, I am not writing this letter to ask for leniency. I am writing because I want you to see the full truth—not just the one on paper, but the one that lives in my soul. I want you to know that I do not take this process lightly. I do not dismiss the weight of the law. My only hope is that the work I've done, and will continue to do as the man I've become, stands on its own merit—not to avoid consequence, but to reflect that transformation is possible and real.
>
> Whatever decision is made, I receive it fully. I walk into this next chapter without resistance—only responsibility, humility, and the commitment to continue living in alignment with the values I once lost sight of. Not just for me, but for my daughters, my family, and the many lives I now strive to serve through the wisdom earned from every lesson.

Mr. Solomon joined a white-collar support group to help him process his actions and to provide guidance for his future. One of the organizers of this group, Andrew Chapin, wrote as follows:

> When we met, he was processing the fresh realities of his plea and what it would mean for both him and his family. That's fairly typical for new members of the White Collar Support Group. As I'm sure you can imagine, some new members can even still be in deep denial or indignant. That is one of the purposes of the support group: to help people accept responsibility for their actions, confront the emotional and practical challenges ahead, and find a way to move forward with their lives. Some members take a long time to reach that point of growth and acceptance. That has not been the case with Howard. As I've come to know him, I've seen that he has been standing in the suffering he caused, with open ears and

an open heart. He has been honest with himself, objectively grasped the situation he created, and I believe reached a radical acceptance. On top of that, and despite being in a period of his life when he himself is in need of support, he has already begun to leverage this responsibility mindset to begin giving back in our group. Despite his present circumstances, Howard has found the energy to share what he has learned and I know it's made an impact on many. I share that to say this: while I cannot speak for the mindset Howard was in while he broke the law, I can speak for how he responded when he hit rock bottom. He **clearly** understands the magnitude of his errors and has already begun using the lessons learned to help those around him.

Mr. Solomon is a young man and this felony conviction as well as the large amount of restitution that he owes will impact his future and paths that he may want to pursue. Mr. Solomon is a young man who will never be back in the criminal justice system.

The recommendation of the probation department of a downward variance to 18 months is a fair and reasonable sentence and is sufficient to meet the goals of sentencing. Such a sentence, which is nine months less than the low end of the advisory guideline and is the mean length of imprisonment in our district, is adequate punishment in this case.

Date: September 10, 2025                    _/s/_____
                                            RANDY SUE POLLOCK
                                            Counsel for Defendant Howard Solomon